# ISAAC N. MITCHELL, Admr.

## *v.*

# SARAH SHANEBERG *et al.*

*Filed at Springfield March 23, 1894—Rehearing denied June Term, 1894.*

1. VENDOR'S LIEN—*how created—waiver.* A vendor's lien does not grow out of any agreement, but, in equity, it is created without an express agreement of the parties. The lien may be waived. If the vendor takes other security for the purchase money, or declares that he does not rely upon the lien, such facts may be regarded as sufficient to discharge it. Any act manifesting a clear intention not to rely upon the lien will defeat it.

2. Where a party conveys land to his daughter as a gift, for the expressed consideration of $7000, for which two notes are taken from the grantee, the one for $5000, payable in two years, without interest, and the other for $2000, payable in two years, with six per cent interest, it being understood that the first note was not a binding obligation, but intended to show the daughter's interest in the land, and that only the interest was to be paid on the $2000 note for the grantor's support for life, it was *held*, that neither the payee of the note nor his personal representative had any vendor's lien on the premises conveyed to the daughter.

3. FRAUD—*setting aside a decree obtained by fraud.* Where the administrator of an estate, by fraud and deception prevents one of the heirs of an estate from making a defense to a promissory note not given to be collected, whereby a decree is recovered against the heir establishing a vendor's lien, to which the estate is not entitled, the heir may maintain a bill to set aside such decree on the ground of fraud.

4. DECREE—*not void because erroneous.* An erroneous decree for a vendor's lien for the purchase money of land, and the enforcement of such decree, when, in fact, no lien exists, is not void, but will be binding, unless reversed upon appeal or writ of error, or set aside because obtained by fraud.

APPEAL from the Circuit Court of Fulton county; the Hon. JEFFERSON ORR, Judge, presiding.

Mr. JOHN W. PITMAN, for the appellant.

Mr. I. R. BROWN, and Mr. H. W. MASTERS, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill for review and relief, brought by Sarah Shaneberg, and George Shaneberg, her husband, Lillie Singley, daughter, and George W. Singley, her husband, and Albert Shaneberg, adult son, and Augustus, Simon L., Susan, Lydia and Henry, by their mother, Sarah Shaneberg, as their next friend, against Reuben A. Henninger and Henry A. Fager, as administrators, with will annexed, of Reuben Henninger, deceased, and Isaac N. Mitchell, as administrator *de bonis non* of the said Reuben Henninger, deceased.

It appears from the record that Reuben Henninger died in Mason county on October 9, 1885, and on October 29, 1885, H. A. Fager and R. A. Henninger were appointed administrators of his estate, with the will annexed. Deceased, in his lifetime, had owned the west half of the north-east quarter, and the north-east quarter of the north-east quarter, of section 3, and the north-west quarter of the north-west quarter of section 2, in township 21 north, range 8, in Mason county. On the 26th day of February, 1884, the deceased executed a deed conveying the land to his daughter, Sarah Shaneberg, and "her bodily heirs," for an expressed consideration in the deed of $7000. At the time of the execution of the deed the deceased was confined to his bed with severe sickness, and not expected to recover. The deed was executed in Havana, and the grantee resided on the land four miles distant, occupying as a tenant of her father. She knew nothing of the deed until it was brought to her by her brother, John Henninger, who delivered it to her and procured the execution of two notes, as follows:

"$5000. HAVANA, ILL., *Feb. 25, 1884.*

"Two years after date I promise to pay to the order of Reuben Henninger five thousand dollars, at Havana, Ill., value received. SARAH SHANEBERG,

GEORGE SHANEBERG."

"$2000.  HAVANA, ILL., *Feb. 26, 1884.*

"Two years after date I promise to pay to the order of Reuben Henninger, Sr., two thousand dollars, at Havana, Ill., value received, with interest at the rate of six per cent per annum.  SARAH SHANEBERG,

GEORGE SHANEBERG."

After the death of Reuben Henninger these notes were found among his papers, and passed into the hands of the administrators of his estate. They filed a bill to enforce a vendor's lien against the land, for the purpose of collecting the notes. No defense was interposed, as will be seen hereafter. A decree was rendered, the land was sold on the decree, and bid in for $7595.46, the amount of the debt and costs. After the time of redemption had expired a deed was made to Isaac N. Mitchell, appellant, bearing date March 16, 1889, and this bill was filed to review and set aside the decree and deed in the proceeding to enforce a vendor's lien, on the ground of fraud.

No contract or agreement was ever made between Sarah Shaneberg and her father in regard to the sale or purchase of the land in controversy. Indeed, prior to the delivery of the deed by John Henninger, on the 26th day of February, 1884, no conversation had ever occurred between Sarah Shaneberg and her father in relation to a sale or conveyance of the land from him to her. If, therefore, the relation of vendor and purchaser existed between the two parties, that relation was created by what occurred between John Henninger and Sarah Shaneberg on February 26, 1884.

As respects what occurred between John Henninger and Sarah Shaneberg on that day the evidence is conflicting. John Henninger testified : "I am a son of Reuben Henninger, deceased. I know of his conveying the land in question and taking her notes. I took part in that transaction. Father told me to go to Mitchell and have him draw up two notes for Mrs. Shaneberg, and have him make out a deed for the old

home place where she lived,—the deed to Sallie. I went up to Mitchell's office and told him what father wanted, and he said he would do it. I think it was the next day, in the evening. I was going home, and father said, 'John, take the notes out to Sallie and have her sign them, and give her the deed, and if she don't sign the notes bring them back to me.' I took the notes and deed out to her, and she signed the notes, and I left the deed, and then took the notes to him the next day some time. Under that direction of father I took the deed and notes to Sallie. Father directed me to have Mitchell draw the notes,—one for $5000 and the other for $2000. The $5000 one was not to draw interest, but to be due two years after its date. The $2000 one was to draw six per cent interest." The witness also testified that he was acting as agent for his father, and that all he said and did was authorized by his father.

Sarah Shaneberg gives a different account of the occurrence. She testified: "He said father had given me the land, and wanted me to have it. He said father had given me $5000 in the land, and $2000 I had to pay interest on as long as father lived, to keep him on. It was the old home. He said father and mother had both signed their right away, and said that father had said that I was always kind and good to him and he wanted me to have the place. The deed was delivered to me at our home, and was delivered by John Henninger on the 26th day of February, A. D. 1884. I handed it back to him, and he said he would take it back to the court house and have it recorded.

Q. "What papers, if any, did he have with him at the time, that he wished you to sign?

A. "He said one was a receipt showing what father had given me in the land, and one was a note drawing six per cent interest as long as father lived. The receipt was for $5000, the note was for $2000. I did not know the $5000 paper was a note. John Henninger did not represent it to be a note,

but a receipt. He said that father had given me $5000 in the land, and this was a receipt to show what father had given me,—that I did not have to pay interest on, or anything. That was mine, he said. He said I had to pay father six per cent interest on that note as long as father lived, and after father's death I would get that,—that all the papers would be given up to me.

Q. "Did you believe and rely on his statements that he then and there made concerning that paper at the time you signed your name to it?

A. "I did.

Q. "Was that the reason,—because you believed what he said was true,—that you signed the papers?

A. "Yes, sir.

Q. "Did you then know that you were executing a promissory note in the sum of $5000, payable to your father?

A. "No, sir; I did not.

Q. "When did you first learn that the $5000 paper which you say was represented to you as a receipt by John Henninger, was other than a receipt, and was in fact and reality a promissory note?

A. "It was after father was dead."

Sarah Shaneberg is corroborated by two other witnesses, who were present and heard what was said,—Lillie Singley and Albert Shaneberg; and her evidence is also strengthened by her husband, George, who testified as follows: "I was not at home when he came there—I was in Havana. John Henninger was there when I came home. It was probably seven or eight o'clock when I got home. It was after dark when I left Havana. After supper we went out of the kitchen into the sitting room, and he said to me: 'I have some papers here for you to sign, George. Father has given Sallie the home place. Here is a note for $2000, and the other is no note. It is to show Sallie gets $5000 in the place. The $2000 note is drawing six per cent interest as long as he lives, and

when he dies the interest stops on that note.' I saw they were both notes. I said: 'I can't understand this. You say Sallie is to get $5000 in the place. I don't see why we should sign this—it is a note.' He said it was not—that the $5000 paper was a receipt."

It is also apparent that Sarah Shaneberg did not know the character of the papers she executed, or the effect of the deed she received, except as she was informed by her brother John, upon whom she seemed to rely. She testified that she did not know a note from a receipt, or a receipt from a note. The deed she received was the first one she ever saw.

The testimony of Sarah Shaneberg is further corroborated by the declarations of her father, made to a number of persons. William A. Henninger testified that he had "a conversation with Reuben Henninger in the spring of 1885 about the Shaneberg lands. He told me in the spring of 1885—I think it was in April or May—he said he gave Sallie Shaneberg $5000 in the farm that they lived on, and that he valued the farm at $7000, and he took her note for $2000. Said she would get the $2000, and more too, at his death. Said he never had given Sallie a cent yet, and he thought it was time he was giving them something. Said that John Henninger took her the deed and got her note for $2000."

Martin Kruse testified that Reuben Henninger, in conversation with him, said "he had given her $5000 in the place, and $2000 she had to pay interest on as long as he lived, and after his death that note was to be canceled. He said he had given the boys eighty acres of land and he hadn't given her anything, and why shouldn't he give her something."

William Grimme testified: "I was well acquainted with Reuben Henninger in his lifetime. I had a talk with him concerning the land in question. I attempted to either buy or rent it. He said he would not sell the place—he wanted to leave the place for his daughter. He said she had to pay interest on $2000 as long as he lived, and when he was dead

the place was to be hers. We talked in German. We did not talk English together."

Daniel Henninger testified that deceased told "me he had given her $5000 in the place, and had her note for $2000. She was to pay six per cent interest on it as long as he lived. I asked him how she was to pay the $7000 that he had against her, and he said the $5000 he had given her, and that he thought the estate would reach the $2000."

Other evidence of a similar character was introduced, but any further reference to the evidence on this branch of the case is not deemed important.

We are satisfied from the evidence that the deceased, in conveying the land to his daughter, Sarah Shaneberg, intended the conveyance as a gift to the extent of $5000; that the note taken for that amount was not taken as an obligation which should be paid, but was in the nature of a memorandum or receipt showing the amount she had received from the deceased. As to the $2000 note, it is clear that the understanding was that the interest should be paid during the lifetime of the deceased, but as to the principal the evidence seems to establish that it was to be paid from the proceeds of the interest or share Sarah Shaneberg should receive from the estate of her father. But if this is not the correct theory in regard to the $2000 note, that fact is not a controlling one, as it is apparent, from all the evidence, that the deceased never relied on or intended to enforce a vendor's lien for the collection of either of the notes. A vendor's lien does not grow out of any agreement, but, in equity, it is created without an express agreement of the parties. The vendor's lien may be waived. If the vendor takes other security for the purchase money, or declares that he does not rely upon the lien, such facts may be regarded as sufficient to discharge it. Indeed, any act manifesting a clear intention not to rely upon the lien will defeat it, as held in *Moshier* v. *Meek*, 80 Ill. 80. As respects the $5000 note, it was never regarded by the deceased as a valid obligation or

debt against the maker, and hence no lien ever existed. As to the other note, no lien was ever relied upon by the deceased, but was waived, and lost. Having been lost as to the deceased, the administrators could not revive it or enforce it.

From what has been said, it follows that the administrators of the estate of Reuben Henninger were not entitled to a decree against Sarah Shaneberg in the proceeding to enforce a vendor's lien, for the amount of the two notes which she had executed, for $7000, or for any amount whatever. But although they were not entitled to a decree, as it was not reversed on appeal or writ of error, it will be binding, unless obtained by fraud. Was the decree fraudulent?

After Reuben Henninger and Henry A. Fager had been appointed administrators of the estate of Henninger, deceased, and the two notes of $5000 and $2000 came into their hands, they learned from Sarah Shaneberg that her father had given her the land, and that she was not to pay the notes, but, disregarding this fact, they undertook to devise a plan under which the collection of the notes might be enforced against the land. They found the deed was made to Sarah Shaneberg and "her bodily heirs," and armed with this fact as an argument to convince her that she did not have the title to the farm, and that it was necessary that proceedings should be instituted for her benefit, on the 26th day of August, 1886, they called on her at her place. As respects this interview, R. A. Henninger, one of the administrators, testified: "Before we went to see her, I think we had learned the condition of her title to the lands for which the notes had been given. So far as I was concerned, I thought she owned it all. I didn't know anything about this 'bodily heirs' business. I am ignorant upon that point. When we went to see her, Harry did the talking. He told her we had come to talk over the note business with her—the notes in payment for the place— and advise with her how to get the place in her own name, so she could borrow money on it. 'To sue and get judgment,

and sell it, and you buy it in and give us a mortgage, or we'll buy it in and take a certificate of purchase, and give you a reasonable time to take it in.'"

Henry A. Fager testified of this conversation: "I told her we had come there to talk about the mutual interest of the estate. I gave her my opinion of what was to her interest, as well as ours, to do; that was, to get the property in her own name, so she could raise money on it. I told her we would sue and get judgment, advertise and sell the property, bid it in in her name, and she could give us a mortgage on the land, or we would bid it in and take a certificate of sale, and give her a reasonable length of time to redeem it. Then I kind of stopped, and she remarked, 'I am a woman; I can't do these things like a man; some of you will have to help me.' Rube spoke up and said we will do it, and said, 'I will try and get John and Angeline to go in with me, and buy your interest in the estate,'" etc.

Sarah Shaneberg testified: "They said they would have to sue the notes—they were there, and they would have to be paid. I told them that I didn't have to pay them—that father had given me the land. They replied they would have to sue them. They said if I would let the land be sold the court would make me a deed, and then I could sell the land. Rube said he would bid the land in in my name, and then they would help me, and they said I would have the land in my own name, and the children would have nothing to do with it. I believed what they said, and relied on their statements, and for this reason made no defense to the foreclosure proceedings. They said I had no defense, and the land would have to be sold and then I would get a deed to it. Rube said if I would make no defense he would help me,—they would all help me. I relied upon his statement. He said that I could trust him,—that as true as there was a God in heaven he would not cheat me out of anything. I would have defended if Reuben A. Henninger had not made these statements."

From the foregoing and other evidence in the record it seems plain that the administrators, after convincing Sarah Shaneberg that she had only a life estate in the farm, induced her to consent that proceedings might be instituted on the notes with a view of placing the absolute title to the land in her. Relying on the statements of the administrators she consented to their proposition, and agreed to make no defense to the action. The object and purpose, however, in bringing suit to enforce a vendor's lien, were not to assist Sarah Shaneberg, but to enforce payment of the notes by obtaining a decree for a sale of the land to enforce an alleged vendor's lien. One of the administrators was a brother and the other a step-brother of Sarah Shaneberg. They were administrators of an estate in which she held an interest as one of the heirs. It was their duty by fair means to collect all claims which were justly due the estate, but they had no right to undertake to enforce claims which they knew were unfounded, and they had no right to mislead appellee, and induce her to consent to an action which would result in a decree depriving her of her property, on the pretence that the action was one brought in her interest and for her benefit. To a certain extent the administrators occupied a relation of confidence to her. They represented the whole estate of Reuben Henninger, deceased, in which she was interested. She had a right to rely upon the truth of their statements, and they had no right to say or do anything to mislead or deceive her. They professed to be acting for her interest, when, at the same time, they were taking means to deceive her and wrongfully deprive her of her property. It is true, as held in *Boyden* v. *Reed,* 55 Ill. 458, that the evidence to impeach a decree for fraud should be clear and satisfactory, but after considering all the facts and circumstances in this case we are not prepared to hold the evidence before the circuit court was insufficient to sustain the decree.

Appellee has assigned cross-errors on the record, but in the view we take of the case, as shown by the entire record, but

little need be said in regard to the cross-errors. It appears that appellee Sarah Shaneberg sold and conveyed to R. A. Henninger an eighty-acre tract of land, a lot in Havana, and her interest in the personal estate of her father, for $4000. This transaction was confirmed by the decree of the circuit court, and it is claimed that the decree is erroneous. We have examined the evidence bearing on this branch of the case, and without going into the evidence in detail, we are inclined to hold that the decree is supported by the testimony.

It is also claimed that the court erred in requiring appellee to pay the costs in the proceedings reviewed and also the costs in this case. The circuit court, in granting the relief prayed for in the bill and at the same time requiring appellee to pay costs, no doubt arrived at the conclusion that appellee was not entirely without fault, and hence granted her relief burdened with the payment of costs, and we do not think the decree in this regard ought to be disturbed. Indeed, after a careful consideration of all the evidence in the case, we are not inclined to disturb the decree on account of any cross-error assigned.

The decree of the circuit court will be affirmed.

*Decree affirmed.*