FRED CROFT *et al.*

*v.*

WILLIAM J. PERKINS *et al.*

*Opinion filed October 24, 1898.*

1. VENDORS' LIENS—*lien arises where the vendor divests himself of title without taking security.*  A vendor's lien for unpaid purchase money will be enforced by a court of equity, as against the vendee or subsequent purchasers with notice, where the vendor has divested himself of the legal title by deed without taking a mortgage or other security.

2. EVIDENCE—*one alleging substitution of oral for written contract has burden of proof.*  One seeking to evade the enforcement of a written contract for the sale of land on the ground that the same was abandoned and an oral contract substituted therefor, has the burden of proving the making of the alleged verbal agreement.

WRIT OF ERROR to the Circuit Court of Effingham county; the Hon. S. L. DWIGHT, Judge, presiding.

The bill in this case was filed by Fred Croft and Margaret Croft, plaintiffs in error, to set aside a deed made by them to William J. Perkins for 220 acres of land in Effingham county, Illinois, or in case the deed should not be set aside, the bill asks for a strict foreclosure of a vendor's lien upon the land so deeded, for the amount of the unpaid purchase money.

The bill alleges that on the 7th day of December, 1895, a contract was entered into in writing between Fred Croft and William J. Perkins, by which Croft agreed to convey

to Perkins 220 acres of land, for which Perkins agreed to pay $15 per acre, making $3300. Said contract is as follows:

"Contract between Fred Croft, of Watson township, and W. J. Perkins, of Union township, both of Effingham county and State of Illinois: Now know ye, all men, etc., that I, Fred Croft, have bargained and sold to the said W. J. Perkins the following lands, to-wit: South-west quarter section 1, town 6, north, range 6, and the north half of the south-west quarter of section 36, and the north-east quarter of section 36, and 20 acres off of the south side of the south-east quarter of the north-west quarter of section 36, all in town 7, range 6, except the first 80 acres, for the sum of $15 per acre, to which the said Fred Croft agrees to give the said W. J. Perkins an abstract title, and the said Fred Croft agrees to take of the said W. J. Perkins the east half of the south-east quarter of section 3, town 6, range 6, as part payment, for the sum of $1000, and the said Perkins agrees to give the said Fred Croft an abstract title to the same. Now, it is further agreed that the said Perkins is to pay the said Croft all the money, less $1000 to be paid in land, if he can possibly get it, on or before the first day of March, 1896, but it is also agreed that if the said Perkins can't raise the said amount to pay it all, then the said Croft is to accept of $2500, including $500 paid by said Perkins in land, and then take a second mortgage for the remaining $800, due in one year, with seven per cent interest.

"Dated this 7th day of December, 1895.
FRED CROFT,<br>W. J. PERKINS."

The bill charges that the land sold to Perkins, and the 80 acres he was to let Croft have, should be conveyed by perfect titles and free from encumbrance, the words in the contract, "an abstract title," being understood by the parties to mean a perfect title, free from encumbrance; that Perkins had the deed prepared for Croft and wife for the 220 acres, and also the deed from himself and wife to Croft for the 80 acres which were to be taken towards the payment of the 220 acres; that Perkins represented that the money was ready to pay for the land, and thereupon Croft and wife executed the

deed for the 220 acres; that after the deed was executed Perkins stated the money was not there, but at Effingham, and that in order to obtain the money it was necessary for Perkins to have the deed and take it to Effingham and have it recorded, when he would get the money and return immediately and pay Croft, and thereby complainants were induced to let Perkins take the deed; that Perkins was a near neighbor to the Crofts, and had often in the past few years advised them in regard to their business matters, and had their confidence; that Perkins did not have the money ready at Effingham, or elsewhere, to pay for the land according to the contract, and had not then even applied for a loan of money; that afterwards, on the 16th of January, 1896, Perkins applied for a loan on the 220 acres of land, and on the 14th of February, 1896, he obtained a loan of $1500 on the said 220 acres so conveyed to him, out of which he paid a $600 mortgage and $42 interest thereon, and $50 interest on a mortgage due from Croft to one Gilmore on another tract of land, and certain expenses, making in all about $696.75, and retained out of the $1500 the sum of $500, which he converted to his own use instead of paying it to Croft; that he only paid Croft $300, making, with the mortgage he paid off for Croft, and the interest, about $996.75; that said sum was all that Perkins had ever paid to Croft in money, directly or indirectly, on the purchase of the land, all of which money was a part of the proceeds of the $1500 mortgage which Perkins put upon the land; that at the time of the payment of the $300 he asked complainants to take a mortgage for the balance of the cash payment, which they refused to do, but were willing to take a mortgage for $800, as provided in the written contract; that Perkins having obtained the deed for the 220 acres of land, and having mortgaged the same for $1500 and retained $500 himself, demanded of the Crofts that they should take a second mortgage on the 220 acres for $1800, due in four years, for the resi-

due of the purchase money, and informed them he could get no more money and could pay no more on the land; that Perkins sets up as an excuse that there had been a change made in the terms of payment, by which Croft agreed to take a second mortgage on the land for $1800; that Perkins was insolvent and unable to pay anything on the purchase of the 220 acres except what he realized by mortgaging or selling the land; that the Crofts, when Perkins refused to make the payment for the land according to the terms of the contract, retained possession of the 220 acres, and did not take possession of the 80 acres Perkins had conveyed to them in part payment for the 220 acres of land. The bill prays for an injunction, and asks that the deed from Croft and wife to Perkins be set aside and said contract canceled, or, in case said deed is not set aside, that complainants be decreed to have a vendor's lien upon the lands in the deed so executed by them, for the unpaid purchase money, etc.

The answer of defendants denies that defendant William J. Perkins stated to complainants on the 7th of January, or at any other time, that he was ready to pay for said premises according to said agreement, but avers the agreement was abandoned by complainants and defendants and a new verbal contract made on or about the 20th day of December, 1895, by which complainants agreed to sell said 220 acres of land to defendant Perkins for the sum of $3300, the land to be paid for, in part, by conveying the title to the east half of the north-west quarter of section 3, township 6, north, range 6, east of the third principal meridian, in Effingham county, Illinois, for $1000, and Perkins to negotiate a loan for as large an amount as could be borrowed upon the said land, and after deducting $500 from said amount of said loan said defendants to pay the complainants the remainder; that for the residue of said $3300 defendants would execute a note, secured by a second mortgage upon the said 220 acres of

land, payable in five years, with seven per cent interest, and that complainants should convey the title to said 220 acres to William J. Perkins and enable him to negotiate a loan and comply with that agreement; admits the conveyance was made January 7, 1896, by complainants to him, but denies it was in fraud of complainants' rights or for the purpose of injuring them; that after obtaining the title to said 220 acres, and with knowledge on the part of complainants, he obtained from Kagay & Kelly a loan thereon for the sum of $1500; that it was agreed complainants should pay to Perkins out of the proceeds of the loan the sum of $500; that he retained said sum, and then paid $600 to Kagay & Kelly on a prior mortgage, with $42 interest, and to S. F. Gilmore $50 interest on a mortgage, and $10 for abstracts, and paid complainants $300 in cash; that defendants, on the 7th of January, conveyed to complainants the 80 acres in section 3; that afterwards defendants executed a note for $1800, payable to complainants four years from January 1, 1896, with seven per cent interest, and prepared a mortgage on said 220 acres, to be second to the mortgage for $1500, but that complainants refused to accept the same and refused to deliver possession of the land. The answer denies all fraud and intention of dispossessing complainants or encumbering the land, except as before stated.

A replication was filed, and at the October term, 1897, a hearing was had and a decree rendered by the circuit court of Effingham county dismissing the bill and rendering a decree against the plaintiffs in error for costs. A writ of error was applied for and the case brought to this court.

HENRY B. KEPLEY, and R. C. HARRAH, for plaintiffs in error.

GILMORE & GILMORE, and W. S. HOLMES, for defendants in error.

Mr. JUSTICE CRAIG delivered the opinion of the court:

*First*—Was there a subsequent verbal contract chang-ing or modifying the written contract? The defendant Perkins claims that the written agreement was aban-doned by both parties. The complainant Croft denies this, and avers that the sale was made under the written contract, and that he made no verbal agreement with the defendant Perkins for the sale of the land in controversy. The burden of proof is upon the defendants to prove, by a preponderance of the evidence, the making of the al-leged subsequent verbal contract. The only direct evi-dence on this point is the testimony of defendant W. J. Perkins, who admits the making of the written contract, but claims he took the land under a verbal contract sub-sequently made, for the same consideration of $3300, and claims Croft was to take a mortgage for $1800, due in four years, with seven per cent interest.

The only testimony introduced to corroborate the theory of a subsequent verbal contract is that of the witnesses Henry Pille, John R. Davis and Henry Imming. An examination of the testimony of Pille and Imming convinces us that it is entitled to little weight. Pille was almost a stranger to Croft, having never seen him but once before, in 1895, when he went to get some to-bacco plants. He says that in the spring of 1896—in the latter part of February,—he was down at Charlie Crosier's on a horse trade; that he was on horseback, and met Croft in the road, and went with him about the distance of ten rods; that he asked Croft to lend him two dollars to pay his taxes, but Croft said he could not,— that he was to get $2500 from Perkins, but Perkins failed to get the money, and he had to make an agreement with him to take $500. Charles Crosier testified that Henry Pille was never at his house for the purpose of trading horses, and that he did not have any conversation at his house or any other place in February, 1896, about trad-

ing horses, and did not have any horses. Croft denies meeting Pille in the road, or that Pille asked him, there or at any other place, to lend him some money, and denies that he told him that he had made another contract with Perkins, or a new one, about selling the land to him; that he never said a word to Pille about the trade or contract, and that the only time he ever saw Pille was two years before the coming summer, which was the time when he came for tobacco plants. George H. Smith testified Pille worked for him; that Pille had a conversation with him the 1st, 2d or 3d of February, 1896; that Pille said he did not know much of benefit to either of the parties to this suit; that Pille fixed the time of the conversation with Croft at the time he went for the tobacco plants, the year before, instead of in the road. Celia Guiles, a witness for complainants, who lived a little over a quarter of a mile from Pille, testified to a conversation with Pille at Pille's own house; that she heard Pille say that he didn't care which one beat in this case; that he had got his pay out of it; that he expected there would be lots of lies sworn to on both sides, and that he would swear to a lie for a dollar. Henry Imming, in his testimony, swears he went to lease a house of Croft, and that Croft said they did not get as much money as they expected, so they had to make a new contract; that Mrs. Croft heard the conversation. This conversation was after the bill was filed in this case, and both Fred Croft and Margaret Croft, his wife, deny telling him about the trade with Perkins. John R. Davis testified he met Croft in the road near Croft's house, about the middle of February, 1896, and had a conversation with him in regard to the land deal with Perkins; that he asked him whether he ever got the $2500 he was to receive from Perkins; that he replied he had not, but had agreed that if Perkins would raise $1500 the trade would go on; that Perkins did raise such sum; that Croft also said something about having received 80 acres of land from Perkins.

A careful perusal of the testimony of Pille and Imming convinces us that it is entitled to little weight in the present inquiry as to whether there was a subsequent verbal contract. Neither does the testimony of John R. Davis add anything in corroboration of the testimony of Perkins on the question of this verbal contract. Croft denies that he saw Davis at the time or place that Davis swears the conversation took place, and denies he made the statements that Davis testifies to. Opposed to the above testimony is the positive testimony of Fred Croft and Margaret Croft, his wife, that no change was made in the written contract and that no verbal contract was afterwards made. When Perkins wished the Crofts to take a mortgage for $1800 they refused, and they swear they told him they wanted their money according to the contract, and that Perkins promised to get the money as soon as he could. Clemmie Gouchenour corroborates the Crofts. She was at their house when Perkins paid the $300, about the 18th of February, and says he told them that the money was ready; that they said they did not want a mortgage for $1800,—the money that was back,—but wanted the money. Sallie Croft, the wife of George Croft, testified that she heard Fred Croft tell Perkins that he would not take any second mortgage for $1800 on the land, and George Croft testifies to the same effect. Another fact proper to be considered is, that the written contract was in the hands of complainant Croft, not taken up or canceled.

The defendants failed to establish, by a preponderance of the testimony, that there was a subsequent verbal contract changing the written contract, but the testimony satisfies us that the written contract is in force, and that the defendants have failed to comply with its terms.

*Second*—Is the grantor Fred Croft entitled to a vendor's lien for the unpaid purchase money, under the facts as shown by the record in the case? The written contract provided that 80 acres of land, valued at $1000, should be

taken as part payment for the 220 acres sold by Croft.
An abstract title was to be given by Perkins to the same.
Perkins was to pay all the unpaid purchase money, less
the $1000 to be paid in land, if he could possibly get it,
on or before the first day of March, 1896, but it was also
agreed in the written contract that if Perkins could not
raise the full amount then Croft was to accept $2500, in-
cluding $500 paid by Perkins in land, and take a second
mortgage for $800, due in one year.   Perkins represented
that he had the money to pay for the land, and Croft and
wife, when they executed the deed, undoubtedly expected
to receive the money in accordance with the terms of the
contract.   Croft swears the deed was delivered to Per-
kins because he said he had the money ready for them
any time they would go to Effingham.   It appears from
the testimony that he did not have the money ready, and
did not make an application for a loan until January 16,
1896, nine days after the deed was given to him by Croft
and wife.   We are impressed with the fact, from reading
the testimony, that Perkins procured the deed by fraudu-
lent representations about having the money, and im-
posed upon his neighbor, Croft, and after he procured the
loan he attempted to avoid his contract by paying only
$300 to Croft and paying off an encumbrance of $600 on
the 220 acres, with $42 interest, and $50 interest due to
Gilmore, and retained $500 of the money borrowed.   This
appears to have been all the money paid by Perkins to
Croft on the purchase of the land out of the $1500 bor-
rowed by Perkins on the land through Kagay & Kelly.
When Perkins paid the $300 Croft and his wife say he
wanted them to take a mortgage for the balance of the
cash payment on the land, but they refused, and wanted
the balance of the money according to the contract, and
were willing to take a mortgage for $800 as provided
therein.   Perkins, after he had mortgaged the land for
$1500, insisted they should take a mortgage for $1800,
due in four years, which they refused to accept.   When

Perkins refused to make the payment due under the written contract the Crofts refused to surrender up possesssion, and still retain possession of the land.

The principle recognized in equity as to liens whose existence is not known or obligation enforced at law, and in respect to which liens courts of equity exercise a very salutary jurisdiction, is stated in 2 Story's Equity Jurisprudence, (Redfield's ed. sec. 1217,) as follows: "In regard to these liens, it may generally be stated that they arise from constructive trusts. They are therefore wholly independent of the possession of the thing to which they are attached as a charge or encumbrance, and they can be enforced only in courts of equity. The usual course of enforcing a lien in equity, if not discharged, is by a sale of the property to which it is attached. Of this we have a strong illustration in the well known doctrine of courts of equity that the vendor of land has a lien on the land for the amount of the purchase money, not only against the vendee himself and his heirs, and other privies in estate, but also against all subsequent purchasers having notice that the purchase money remains unpaid. To the extent of the lien the vendee becomes a trustee for the vendor, and his heirs and all other persons claiming under them with such notice are treated in the same predicament." In section 1219 the same author also says: "The principle upon which courts of equity have proceeded in establishing this lien in the nature of a trust is, that a person who has gotten the estate of another ought not, in conscience, as between them, to be allowed to keep it and not pay the full consideration money." This doctrine has been recognized by this court in *Dyer* v. *Martin*, 4 Scam. 146, in the following language (p. 151): "In fact, it is a general rule in equity,—and it requires a very strong case to make an exception,—that no man shall be compelled to part with his title till he receives the consideration; and so vigilant are the courts of equity to protect the seller, that although an absolute convey-

ance be made and no mortgage or other security taken, still, in the hands of the vendee or a subsequent purchaser with notice, the vendor has a lien on the land for his money."

A vendor's lien proper arises in cases where the owner of land conveys the same by deed, thus divesting himself of the legal title, and where some part or all of the purchase price remains unpaid. In such case the grantor retains, in equity, a lien for the unpaid purchase money. (*Robinson* v. *Appleton,* 124 Ill. 276.) The case at bar comes clearly within this principle of equity. Fred Croft, the vendor, conveyed the 220 acres of land to W. J. Perkins, the vendee. The legal title is still in the vendee and a part of the purchase money remains unpaid.

Under the written contract between Croft and Perkins the 220 acres of land were sold at $15 per acre, making the total consideration $3300. Croft was to take 80 acres of land as part payment for $1000, free of encumbrance. The balance of the purchase money was to be paid by Perkins on or before March 1, 1896, but if Perkins could not raise all the money, then Croft was to accept $2500, including $500 paid by Perkins in land, and take a second mortgage for the remaining $800, due in one year, with seven per cent interest. It is admitted that the deed was made by Perkins for the 80 acres which were to be taken by Croft for $1000 (the encumbrance of $500 to be satisfied) towards the purchase price of the 220 acres, but it is contended that it was not worth that amount. The land, by the proof, was within a few miles of Croft's home, and could have been easily seen by him, and he could have satisfied himself of its value. If he was cheated as to its value it was through his own negligence.

The testimony shows that only $300 in money was paid Croft; that Perkins paid off an encumbrance of $600 and $42 interest, which was a lien upon the 220 acres, and paid to S. F. Gilmore $50 interest due from Croft on a mortgage on another tract of land, and some expenses

for abstracts, making the total amount paid by Perkins to Croft $996.75, which, with the $500 in land, makes a total of $1496.75 paid by Perkins on the purchase price of the 220 acres. Perkins testifies he told the Crofts that if they would take the 80 acres of land he had in Union township at $1000, or at $500 subject to a mortgage of $500, he could get his equity out of his 80, if nothing else. This shows that it was understood by Perkins that he was only to receive $500 for his 80 over and above the mortgage, which would leave a balance of $1803.25 due Croft on the purchase price, for which, as vendor, he should have a lien upon the 220 acres, subject to the mortgage of $1500, the mortgagee having loaned the money without notice, so far as the record shows, of the rights of Croft.

The decree of the circuit court is reversed and the cause remanded, with directions to the court to enter a decree requiring Perkins to pay the amount found due, with interest thereon, within a short day to be fixed by the court, and in default of payment that the premises be sold in satisfaction of the amount.

*Reversed and remanded.*