(No. 12593.—Reversed and remanded.)
JENNIE WRIGHT *et al.* Defendants in Error, *vs.* BRYAN J.
BUCHANAN *et al.* Plaintiffs in Error.

*Opinion filed April 15, 1919.*

1. EVIDENCE—*testimony of attorney conducting a case will be given little weight.* While it is not proper practice for an attorney in a case he is conducting to testify in his client's behalf he is not for that reason incompetent though his testimony should be given little weight, but an attorney should not be criticised for testifying where he is called as a witness, over his own objection, and thereafter does not appear as attorney in the case.

2. VENDORS' LIENS—*vendor's lien is creature of equity and not of contract.* A vendor's lien does not grow out of an agreement between the parties but is an equity raised by courts of chancery for the benefit of vendors of realty, which will be enforced or denied, as the exigencies of each case may require, in every sale and conveyance of land where the purchaser has not paid in full.

3. SAME—*burden is on vendee to prove lien was excluded by agreement.* The law presumes the retention of a vendor's lien in favor of the unpaid vendor, and the burden is on the vendee to prove that the terms of the contract of sale or the concomitant circumstances of the transaction satisfactorily show that the lien was purposely excluded and that the vendor relied on the personal credit of the vendee or other security.

4. SAME—*it is not essential to lien that the purchase price is to be paid in money.* The vendor's lien arises whether the purchase price is to be paid in money or by the rendition of services or any other valuable consideration, definite and ascertained, and stipulated as the equivalent of the amount of the purchase price and arising out of the sale of land against which the lien is sought to be enforced.

5. SAME—*agreement for support of the grantor is an equitable mortgage.* An agreement contained either in the conveyance or in a separate instrument for annuity or the support of the grantor will convert such conveyance or instrument into an equitable mortgage.

6. SAME—*vendor's lien does not attach to gift.* The vendor's lien does not attach where land is conveyed as a gift.

7. SAME—*recitation of payment of consideration is not conclusive against vendor's lien.* The recitation of payment of consideration in a deed or other like document executed at the time of the transaction is not conclusive as against the vendor's lien but is only *prima facie* evidence of the payment, which the vendor may explain or rebut by parol testimony in seeking to enforce his lien.

8. SAME—*proof must be clear to establish gift.* A gift, whether direct or in trust, must be established by clear proof, with no uncertainty either as to the subject or object of the gift, and the acts constituting the transaction must be consummated and not remain incomplete or rest in mere contention.

9. SAME—*lien may be enforced although action at law lies upon notes.* Where the purchase money of land has not been paid the vendor may file his bill for specific performance or for a vendor's lien and subject the land to sale and satisfaction, even though an action at law lies upon notes given for the purchase price.

10. SAME—*a vendor's lien will exist against land conveyed to minors and may be enforced after grantees become of age.* Where land is conveyed to minors and notes are given for the unpaid purchase price a vendor's lien will exist against the land, and if, after the minors have become of age, they refuse either to pay the notes or agree to cancellation of the deed the lien may be enforced.

11. MINORS—*notes of infants are voidable and not void.* Promissory notes issued by infants, whether negotiable or not, are voidable and not void.

12. SAME—*right of infant to avoid contracts is personal.* The right of an infant to avoid contracts is personal and cannot be taken advantage of by an adult with whom he deals.

13. SAME—*adult contracts with infant at his peril.* An adult contracts with an infant at his peril as the infant may decline to perform his part of the agreement, while the adult is bound by the contract and is liable for its breach as fully as if the other party had been of full age.

14. SAME—*contract must be repudiated by infant after becoming of age and within period fixed by Statute of Limitations.* In order to take advantage of minority as ground for refusing to carry out a contract the infant must repudiate the contract after becoming of age and within the period fixed by the Statute of Limitations.

WRIT OF ERROR to the Circuit Court of Richland county; the Hon. CHARLES H. MILLER, Judge, presiding.

H. G. MORRIS, (JOHN A. MACNEIL, guardian *ad litem,* of counsel,) for plaintiffs in error.

McGAUGHEY, TOHILL & McGAUGHEY, and LEWIS & LEWIS, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a writ of error sued out to reverse a decree of the circuit court of Richland county finding that the executors of the will of Samuel Berry, deceased, had a vendor's lien for $2500 against about 76 acres of land in that county. The bill was filed by Berry in his lifetime and the testimony was partially heard, including his own, before his death, which occurred during the pendency of the suit. His executors and heirs were substituted as complainants in the bill and a decree was thereafter rendered.

At the time of the hearing Samuel Berry was about eighty-three years of age. He had been a farmer all his life and had acquired a good farm and some personal property. He was married twice, having by his first wife one son and two daughters. When his first wife died these children were grown, and one of the daughters, Sarah Pool, was married and kept house for him until his second marriage, in 1881. His second wife had been married before. She brought with her to Berry's home a youth about sixteen years old, Thomas A. Buchanan, whom she had raised from the time he was two years old. The evidence tends to show the children of the first marriage did not get along well with the second wife and her foster son. Shortly after the second marriage the daughter Jennie married, and she and her sister both left home and went to keeping house, with their respective husbands, on farms in the vicinity. The son also left home and was married, living and farming in the neighborhood. The foster son of the second wife, Thomas Buchanan, married four or five years after Berry's second marriage and went to live on a farm several miles away. This left Berry and his wife without anyone to help them on the farm, and Buchanan and his wife, at their request and apparently at the urgent insistence of the foster mother, moved back to the Berry farm and lived there for a considerable time, carrying on the farm and keeping house for the old people. Several of Buchanan's children were

born there.  The evidence also tends to show that while Buchanan was living away from the farm, his two sons, Bryan and Council, the plaintiffs in error herein, lived with Berry and his wife during several winters, doing the chores and going to school.  The evidence also tends to show that during these years the relations between Berry and the family of Buchanan were friendly.  In 1913 Berry conveyed 33 acres of his farm land, upon which his house and barn were located, to his wife, reserving a life estate in himself, and his wife on the same day conveyed this 33 acres to her foster son, Buchanan.  Before that time it appears that Berry had conveyed some of his land to his daughters, retaining only in his own name the tract of 76 acres here in question.  During the early part of 1915, and for some time theretofore, Buchanan had been living on the 33-acre tract and farming it, together with the 76 acres.  The evidence tends to show, also, that in February, 1915, Berry decided to deed this 76-acre tract to Buchanan's two sons, Bryan and Council.  These two boys were at that time seventeen and fifteen years of age, respectively, and were living on the farm with their parents, helping with the farm work.  Shortly before that time Berry's stock had been troubled by a dog belonging to Pool, one of his sons-in-law, and Berry told Buchanan's two sons that in order to stop that dog interfering with the stock they should kill it, if necessary, and he would stand by them in any trouble that arose.  The young men shot the dog and Berry sided with them in the trouble that followed with his son-in-law over such shooting.

On February 28, 1915, Berry sent word to a neighbor who was a justice of the peace, Adam Griesemer, to come and draw some deeds for him.  The justice came to the Berry home and talked matters over, but as it was late Saturday night and the discussion had lasted until after midnight, and for fear a deed made on Sunday might not be valid, they agreed to put the matter off until Monday.

On Monday, March 2, Griesemer again went to the Berry farm and drew up a deed for the 76 acres, running from Berry and his wife to Bryan and Council Buchanan. Mrs. Berry was at that time very ill and was unable to sign, so the justice signed her name to the deed and she made her mark, and the acknowledgment of both Berry and his wife was taken by the justice. Mrs. Berry died the same day. While the justice was drawing up this deed Thomas Buchanan drew up a series of nine notes,—eight for $300 each and one for $100. They were made payable to Berry, one, two, three, four, five, six, seven, eight and nine years, respectively, after date. On the back of each of these notes was written, "This note is to be boarded out by Samuel and Sarah Berry," Sarah being the name of the second wife. The justice testified that Berry asked him, on the day he drew the deed, how he could draw the notes and have them secured by a mortgage in such way as to make him safe for the purchase price of the land. The justice replied that as the boys were minors they would have to have a guardian appointed by the court to act for them and then the notes and mortgage could be signed by the guardian. This conversation, apparently had in the presence of the boys and Buchanan, took place in the hearing of Mrs. Berry, who was lying in bed, sick. She immediately objected and said she didn't want it that way, and Berry said, "Well, mother, you won't be with me long and I am going to fix it any way you want." It is not entirely clear from the evidence who suggested putting the indorsement about boarding out the debt on the back of the notes. From the testimony of the justice it is apparent that he was not the one who originally suggested it. Buchanan and his sons testified that the suggestion was made by Berry. Berry did not remember making the suggestion, and apparently was of the opinion that it was put on by Buchanan as his own idea. All the evidence shows, however, that it was written on the notes before they were delivered to Berry. After the notes and

deed were drawn the nine notes were signed on the face by the two boys, Bryan and Council, and, either at that time or later, Berry put his name on the back under the notation as to boarding them out. The testimony tends to show that Berry said he wanted the notes and deed put in his tin box, although Buchanan testified that the deed was delivered to him to record. It was not recorded for some time thereafter, and Buchanan testified it was finally done at the suggestion of Berry, while Berry testified that he did not so request, claiming that he never intended to have it recorded. Buchanan further testified that some weeks later these nine notes were handed to him by Berry and that Berry stated that he was giving them to him; that he could settle the question with his two boys as to who owned the land; that they could pay the notes and thus own the land themselves, or they could let their father have it and thus redeem the notes. Buchanan also testified that Berry signed his name on the back of each of these notes just before giving them to him. Berry denied that he ever gave or transferred these notes to Buchanan. The evidence seems to show that a short time after these proceedings were commenced in court Buchanan had these notes in his possession and had them with him at the time some of the testimony in this case was being taken, but they were mislaid during the progress of the trial. At the time these notes were executed Berry was in poor health. He had a disease of the feet, which made it impossible for him to walk without assistance, and he spent most of his time in a wheel-chair. In April, 1915, on account of his health, he went to a sanitarium at Olney, the county seat of Richland county, to be examined and possibly operated upon. After arriving there he sent for his lawyer, R. S. Rowland, and at his request Rowland prepared a bill of sale to Buchanan of all the personal property on the farm, which Berry signed, and at the same time assigned to Buchanan a certificate of deposit for about $1000.

While this litigation was in progress the trial court appointed J. A. MacNeil as guardian *ad litem* for the two minors, Bryan and Council Buchanan. During the trial, at the guardian *ad litem's* suggestion and insistence, Rowland, over his own objection, was called to testify. Counsel for defendants in error also objected to his testifying and insisted that his testimony was incompetent; that Rowland had theretofore been, during the litigation, the attorney for Thomas Buchanan. The evidence tends to show that Rowland has not appeared in the case as an attorney since he gave his testimony. This court has repeatedly said that when an attorney himself furnishes, by his own testimony, evidence to help himself succeed on the trial, such evidence will be closely scanned; that while it is not proper for an attorney, in a case he is conducting, to testify on his own behalf, he is not for that reason incompetent, and if he chooses to testify he may do so, but his testimony should be given little weight. (*Wilkinson* v. *People,* 226 Ill. 135; *Grindle* v. *Grindle,* 240 id. 143; *Wetzel* v. *Firebaugh,* 251 id. 190; *Rice* v. *Winchell,* 285 id. 36.) From Rowland's statement at the time he was called upon to testify it was apparent that he understood the rulings of this court with reference to an attorney testifying. In view of the circumstances under which he gave his testimony in this case we do not think he is subject to criticism for testifying.

After treatment at the sanitarium Berry went back to Buchanan's home and remained there until the latter part of September of that year, when he accepted an invitation from his daughter Mrs. Wright to visit her. It seems to have been the understanding of the Buchanans that he would return soon and live with them, but he remained with Mrs. Wright until after the beginning of this litigation, and the evidence shows that he lived with his children until his death. The original bill in this case was filed October 23, 1915, by Berry, praying that the court hold that the 76-acre tract of land was subject to a vendor's lien in his

favor.  Shortly after Berry went to live with his daughter, he sent his son-in-law Wright, accompanied by a grandson, (Mrs. Pool's son,) to Thomas Buchanan to ask him for the notes here in question, and for another note for $300 which Buchanan had signed, with one Clodfelter as surety. Buchanan told Wright, in the presence of young Pool, that all these notes were lost.  He also told them that the $300 Clodfelter note had been signed over to him by Berry.  It is not claimed that Buchanan at this time told Wright that the notes here in question, given in payment of this 76-acre tract, had been given to him by Berry.  Wright and the Pool boy testified that Buchanan then only claimed that these notes had been stolen and he could not produce them.

Considerable testimony was introduced by plaintiffs in error substantially to the effect that after taking these notes and executing the deed to the 76-acre tract of land Berry had made statements to the assessor and various neighbors that would indicate that he had given the 76-acre tract of land to the Buchanan boys and that he had fixed it so that his own children would not get any more of his property, as he claimed they had not treated him right.  Berry testified during this litigation, denying that he ever made any such statements.  He died on January 16, 1917, leaving a will, which was duly probated, and by which he gave $400 to one church, $100 to another, and the balance of his estate, "if any there be," to his two daughters and son.  The testimony shows, without contradiction, that no payment had been made by Bryan and Council Buchanan on any of these notes before Berry's death.

From the evidence before us it is not absolutely clear as to whether Berry, at the time these notes were executed, expected them to be paid in cash or that he considered the transaction a closed one so far as conveying the land was concerned.  It is not claimed that any part of these notes was paid by his boarding with the boys.  It is quite clear from this record that during the last years of his life Berry

was in poor health physically and quite easily influenced by those with whom he was associated. His own testimony as to his intention is not entirely consistent or in harmony, neither is the testimony on behalf of the plaintiffs in error. The claim of counsel for plaintiffs in error that these notes were understood only to be paid by Berry and his wife boarding them out with the grantees in the deed is inconsistent with the testimony of Thomas Buchanan that these notes were afterward given to him by Berry with the statement, "You and the boys can settle this between you; the notes are yours, and the boys can redeem them by paying them off or deeding the land back and redeeming the notes."

A vendor's lien does not grow out of an agreement between the parties but is simply an equity raised by courts of chancery for the benefit of vendors of realty, which will be enforced or denied as the exigencies of each particular case may require. (39 Cyc. 1788; see, also, *Mitchell* v. *Shaneberg,* 149 Ill. 420.) "It is a general rule in equity, and it requires a very strong case to make an exception, that no man shall be compelled to part with his title till he receives the consideration, and so vigilant are the courts of equity to protect the seller that although an absolute conveyance be made and no mortgage or other security taken, still in the hands of the vendee, or a subsequent purchaser with notice, the vendor has a lien on the land for his money." (*Dyer* v. *Martin,* 4 Scam. 146; *Croft* v. *Perkins,* 174 Ill. 627.) The principle on which a vendor's lien is generally regarded as resting is one of natural justice,— that one who gets possession of the estate of another ought not in conscience to be allowed to keep it without paying the consideration, although other grounds, such as the presumed intention of the parties or the existence of a trust between them, have been assigned. (39 Cyc. 1789.) It has been held that when the purchase money of land has not been paid, "the vendor may file his bill for a specific performance to coerce the payment of the money and to

subject the land to sale for satisfaction, although an action at law would lie upon the note. (*Andrews* v. *Sullivan,* 2 Gilm. 332.) This being so, we can perceive no reason why his personal representatives may not proceed in the same manner." (*Burger* v. *Potter,* 32 Ill. 66.) As the vendor's lien is a creature of equity to relieve the vendor when he has parted with his land and has not been paid therefor, it arises and the doctrine is applicable in every sale and conveyance of land when the purchaser has not paid in whole. The law presumes the retention of the lien in favor of the unpaid vendor unless the terms of the contract of sale or the concomitant circumstances of the transaction satisfactorily show that the lien was purposely excluded and that the vendor relied on the personal credit of the vendee or other security. The burden of establishing this is on the vendee. (29 Am. & Eng. Ency. of Law,— 2d ed.—742, and cases cited.) It is not absolutely essential that the purchase price of the land was to be paid in money. If the land be sold at a specific figure and it is agreed mutually that certain personal services to be rendered the vendor shall equal that figure, the lien exists. The form of the consideration within these limitations is immaterial so long as the consideration is susceptible of appraisement at or reduction to a definite money value, as the consideration will be deemed a mere agreement as to the method in which the purchase price is to be paid and will not divest the transaction of its intrinsic nature. The cardinal rule deduced from all the cases seems to be that the lien lies only for a debt, which may be either for money or the rendition of services or any other valuable consideration, definite and ascertained, and stipulated as the equivalent of the amount of the purchase price and arising out of the sale of land against which the lien is sought to be enforced. (29 Am. & Eng. Ency. of Law,—2d ed.—743-745, inclusive, and cases cited.) It has been held that an agreement contained

either in the conveyance or in a separate instrument for annuity or the support of the grantor will convert such conveyance or instrument into an equitable mortgage. (39 Cyc. 1792, and cases cited.) The vendor's lien does not attach where land is conveyed as a gift. *Mitchell* v. *Shaneberg, supra.*

It is clear from the evidence as to what took place at the time the deed and notes here in question were executed, that Samuel Berry did not originally intend to make a gift of the land in question to Bryan and Council Buchanan, and it is quite apparent that he did not so intend in the end, because if he had he would not have taken their notes for any of the consideration. The recitation of payment of consideration in a deed or other like document executed at the time of the transaction is not conclusive as against the vendor's lien but is simply *prima facie* evidence of the payment, which the vendor may explain or disprove in seeking to enforce his vendor's lien and which he can explain or rebut by parol testimony. (29 Am. & Eng. Ency. of Law,—2d ed.—742; 39 Cyc. 1791.) This court has held that the law requires that a gift, whether direct or in trust, shall be established by clear proof, and that no uncertainty shall exist, either as to the subject or object of the gift; that the act or acts constituting the transaction must be consummated and not remain incomplete or rest in mere contention. (*Barnum* v. *Reed,* 136 Ill. 388; see, also, *Boudreau* v. *Boudreau,* 45 Ill. 480; *Williams* v. *Chamberlain,* 165 id. 210.) While Thomas Buchanan testified that these notes were given to him by Berry a few weeks after they were executed, Berry positively denied that he ever gave them to Buchanan or ever intended to give them to him. The chancellor heard this testimony and was in better position to pass on its weight and bearing than we are. We cannot say from the record that the gift to Buchanan was so clearly established by proof that the finding of the chancellor on this question is not justified by the evidence. Indeed, the

weight of the evidence and circumstances proven tend to show that these notes were not given to Buchanan by Berry.

Counsel for plaintiffs in error suggest that as defendants in error had an adequate remedy at law to recover on these notes, equity would not have jurisdiction to give the relief prayed for in this bill. It is the settled law in this State that when the purchase money of land has not been paid the vendor may file his bill for specific performance and subject the land to sale and satisfaction, even though an action at law would lie upon the note. *Andrews* v. *Sullivan, supra;* see, also, *Burger* v. *Potter, supra; Robinson* v. *Appleton,* 124 Ill. 276; *Winter* v. *Trainor,* 151 id. 191.

Counsel for plaintiffs in error also argue that the decree in this case is wrong because it is entered against minor defendants. The record shows that Bryan Buchanan was nineteen years of age at the time the bill was filed but became of age during the litigation; that Council Buchanan will not be of age until some time during 1919. They also argue that the decree was wrong in holding these notes void and not voidable. The general rule is that promissory notes issued and accepted by infants are voidable and not void; and this is so whether they are negotiable or not. (16 Am. & Eng. Ency. of Law,—2d ed.—284, and cases cited.) The right of an infant to avoid a contract is personal and can not be taken advantage of by an adult with whom he deals. The adult enters into a contract with an infant at his peril, for the infant may decline to perform his part of the agreement. When an agreement has been fully performed the adult is bound by the contract as fully and completely as if the other party had been of full age, and the adult will be held liable for its breach. In order to take advantage of minority in refusing to carry out a contract the weight of authority is that the contract executed by infants must be repudiated after the infants become of age within the Statute of Limitations. (16 Am. & Eng. Ency. of Law,— 2d ed.—296-299, inclusive.) It is clear under these au-

thorities that these notes signed by the two Buchanan boys during their minority could not be enforcible against them any time before they were of age, either for the purpose of making them pay the notes in cash or to comply with the provision on the back of the notes that they might be boarded out.  If, however, after they became of age the notes were ratified by them or they refused to agree to a cancellation of the deed to the land here in question, then a vendor's lien would be enforcible against the 76-acre tract of land as to them.  (39 Cyc. 1800; *Weed* v. *Beebe,* 21 Vt. 495; *Grace* v. *Whitehead,* 7 Grant's Ch. (Upper Can.) 591; 16 Am. & Eng. Ency. of Law,—2d ed.—290.)  And the lien would continue after the conveyance of the land to a third person with notice of the existence of the lien or to a mere volunteer.  (39 Cyc. 1800.)  After the boys became of age they could not, under the authorities, repudiate the payment of these notes without returning the value of the property for which the notes were given.  (*Grace* v. *Whitehead, supra.*)  It is clear from what took place at the time the deed for this tract of land was executed and the notes signed by the Buchanan boys that Berry did not intend to give the land to the boys outright, without any money consideration or its equivalent being paid by them. The evidence, in our judgment, shows, beyond question, that he intended to deed it to them for a consideration of $2500 and planned to take notes and a mortgage back for that consideration.  Possibly, in view of the testimony in this record, he thus planned for the purpose of putting the title of the land in such condition that his own children could not obtain it after his death.  When he found from the justice of the peace that there would have to be a guardian appointed by the court for the minors in order to make the mortgage and notes valid and his wife objected, he decided, because of her extreme illness and his desire to please her, not to follow that plan but to take the notes signed by the boys, only, without appointing a guardian, whether the

notes thus executed were legal and valid or not, and the amount of these notes was a definite fixing of the amount of the purchase price; and this was so even though Berry finally agreed to accept the condition on the back that they should be boarded out. We think, under the authorities, the lien for the amount called for by the notes can be enforced against the 76-acre tract of land.

As the payment of these notes could not be legally enforced personally against the Buchanan boys until after they became of age, it would seem, under the liberal rules laid down by the authorities as to the enforcement of a vendor's lien, that the personal representatives of the deceased vendor should have this lien on the land until the notes are enforcible. The whole question of the vendor's lien and the rights of these minors is here in a court of equity, and the two Buchanan boys cannot legally convey the land until they become of age, and if they attempt to convey it thereafter, the lien should follow the land in the hands of the grantee. If they do not dispose of it but retain the land until after they become of age they should be compelled to re-convey the land or to pay the notes or the lien should be enforced for the value of the notes against the land. In accordance with these principles of equity, the lien, although it will continue to exist against the land until both the Buchanan boys become of age, should not be enforced by sale of the land until they become of age and thereafter refuse or neglect to re-convey said land or pay the amount due on these notes. The decree of the circuit court should so provide, and should also provide, and in terms state, that the vendor's lien shall exist against this land until these notes are paid, and should also provide that if the land is not re-conveyed or these notes are not paid before or within a reasonable time after the Buchanan boys both become of age, then that the circuit court, on the filing of a supplemental bill and a hearing thereon after due notice to all parties hereto, may enter an appropriate order

287 – 31

or decree for the enforcement of the lien by the sale of the land in question.

The decree of the circuit court is reversed and the cause remanded to that court with directions to modify the decree as herein provided.

*Reversed and remanded, with directions.*