**Harris Trust & Savings Bank, Trustee, Appellee, v. Helen H. Morse et al.  On appeal of Robert H. Morse, Appellant.**

## Gen. No. 29,898.

1. TRUSTS—*oral voluntary trust.* A court of equity may establish and enforce a voluntary oral trust concerning personal property, but the acts or words relied on as creating such a trust must be unequivocal, admitting of but one interpretation and manifesting a completed transaction *in præsenti.*

2. TRUSTS—*proof of oral voluntary trust.* Proof of acts or words relied on as creating an oral voluntary trust must be clear and convincing, not only of the existence of the trust, but also as to its essential terms and conditions.

3. TRUSTS—*revocation.* When a trust has been perfectly created, it is not revocable at the will of the party who created it unless he has expressly reserved the power of revocation.

4. TRUSTS—*intention to establish oral trust by written instrument.* If a person intends to establish a trust and with that intention transfers the title of the property to a trustee and orally states what the terms and conditions of the trust are to be, these facts, though clearly proved, are insufficient to create a voluntary trust, where it also appears that the donor intends the trust to be established by a written instrument or deed signed by him.

5. TRUSTS—*incomplete creation as creating resulting trust.* Where property was transferred with the intention of creating a trust, but the donor died before the trust was completed, a resulting trust arose in favor of his heirs and devisees as to the property received by the intended trustee.

Appeal by defendant from the Superior Court of Cook county: the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1924. Reversed and remanded with directions. Opinion filed October 6, 1925. Rehearing denied and additional opinion filed October 19, 1925.

LORD, WIRE & COBB and JOHN E. KEHOE, for appellant; JOHN S. LORD and A. C. WETTERSTORM, of counsel.

CHAPMAN, CUTLER & PARKER, for appellee.

JOHN J. HEALY, Guardian *ad litem* and Solicitor and WILLIAM S. BECK, for minor heirs; JOHN P. BARNES, JOHN E. TRACY, WILLIAM H. RADEBAUGH and JOHN J. HEALY, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

In March, 1921, complainant and Charles Hosmer Morse entered into a written agreement, dated June 19, 1920, by which Morse assigned to the complainant, as trustee, 10,000 shares of the common stock, without par value, of Fairbanks, Morse & Co., an Illinois corporation, and complainant agreed to hold the same and collect the income therefrom for ten years, "or until such time as this trust shall be terminated" as therein provided, and to pay the entire net income from time to time, less its reasonable charges, to the First Trust & Savings Bank, of Chicago, "as Trustee, under an agreement with Charles Hosmer Morse, being Trust No. 2343"; also "whenever directed in writing" by said bank, as such trustee, to transfer and assign "the entire principal of the trust estate" to said bank, "as Trustee under said Trust No. 2343." Two months later, Morse died without having executed any written instrument or agreement with the First Trust & Savings Bank specifying the nature or purpose of said "Trust No. 2343,"

or defining the powers and duties of that bank, as
trustee, with reference to the disposition of any money
or stock it might receive from complainant. Com-
plainant collected and held the dividends accruing
on the stock, and about a year after Morse's death
filed its bill in equity alleging that it was in doubt as
to its powers and duties under its written agreement
with Morse, and asking the court for instructions.
After an extended hearing, in which all parties in-
terested were represented, a decree was entered which
finds that although Morse in his lifetime contemplated
that "Trust No. 2343" should be reduced to writing
and signed, both by himself and by the First Trust
& Savings Bank, as trustee, and although that was
never done, still, Morse had "orally declared said
trust" and that "the same was effectively by him
declared and established by his language and conduct
during his lifetime." The decree sets forth the na-
ture of such oral trust as found by the court, directs
complainant to proceed according to its written agree-
ment with Morse, and specifies the terms and condi-
tions upon which the First Trust & Savings Bank shall
hold the trust funds and estate after receiving the
same from complainant, and when, how and to whom
such funds shall be paid or assigned by said First
Trust & Savings Bank. From this decree, Robert
Hosmer Morse, a son of the deceased, appeals.

While the evidence is voluminous, the essential
facts are not disputed. When the written agreement
with complainant was executed, Charles Hosmer Morse
was a retired manufacturer, eighty-eight years of age,
living at Winter Park, Florida. He had two sons and
a daughter living, nine grandchildren and two great-
grandchildren. His first wife was dead and he had
married a second time in 1911. He was one of the
founders of the manufacturing and mercantile busi-
ness conducted under the name of Fairbanks, Morse &
Co., and had accumulated a large fortune. His two
sons, Charles and Robert, were men of means and were

both heavily interested with him in the same business. Two of his grandsons (appellant's sons, Charles Hosmer Morse, Third, and Robert Hosmer Morse, Jr.) occupied minor positions in the business of the corporation.

In 1908, the elder Morse (who will be hereafter referred to as Mr. Morse) made his last will and testament. In it he bequeathed to the First Trust & Savings Bank, in trust for the benefit of the two grandsons last mentioned, 2,000 shares of stock in Fairbanks, Morse & Co., of Illinois; and after stating that he desired his two sons to succeed him in business, he bequeathed to them all the rest of his stock in that corporation and its associated corporations, to be divided equally between them, except that the 2,000 shares placed in trust for appellant's two sons were to be deducted from appellant's share. This bequest to the sons was charged with the payment of sundry specific legacies and all debts and expenses of administration. All the residue of the testator's estate (consisting of other stocks, bonds and real estate) was devised and bequeathed to the First Trust & Savings Bank, in trust, for the benefit of his daughter. That bank was appointed executor of the will. By a codicil made in 1917, the bequest to the testator's sons was further charged with the payment of inheritance taxes, ''for the reason  *  *  *  that in the distribution of my estate my said two sons will have received more of my estate than has or will my daughter.''

In 1919, some of the companies theretofore associated with Fairbanks, Morse & Co. of Illinois were consolidated with it. At the same time, the number of shares of common stock was increased tenfold, and the shares were given no par value.

In June, 1920, Mr. Morse visited Chicago. While there, in a conversation with Frank M. Boughey, secretary of Fairbanks, Morse & Co., who had handled many of Mr. Morse's personal matters, he said he felt

disposed to cancel the provision in his will in favor of his two grandsons, but would first talk to his son (appellant) about it. A day or two later, he told Boughey that after talking with appellant, he "felt" he should continue his gift to his two grandsons, making the gift 20,000 shares instead of the original 2,000 shares, because of the increased capitalization, and would prefer to make the donation through a trust fund and not through his will; that he would make another codicil, canceling the original gift to his grandsons and would create a trust for 5,000 shares in favor of each of them; that he "felt" that by putting the stock in trust for them during his lifetime it would encourage them to take an interest in the business. One of the grandsons had recently married and the other was about to be married, and Mr. Morse said their salaries were not sufficient to maintain them as he thought they ought to maintain themselves, and that he thought the income from the trusts of about $500 a month each, "would be sufficient for their purpose and it would be ample to support them, supplemented by their own earnings." He also said that he would not place more than 10,000 shares in trust at that time "because he had promised $100,000 to Rollins College, to be spread over five years." This allusion to Rollins College referred to the fact that in April, 1920, he had promised that college a donation of $100,000, provided $400,000 more was raised by it within a certain time, and it was uncertain at that time whether the college would be able to raise the additional amount or not.

A few days after this conversation with Boughey, Mr. Morse carried out his expressed intention to create a trust for the benefit of each of said two grandsons, by assigning and delivering to complainant, as trustee, two certificates of stock for 5,000 shares each, and by joining with complainant in executing two separate trust agreements, one for each of such stock certificates. Each agreement provides that out of the

net income from the 5,000 shares so assigned, complainant shall pay to the grandson named therein $6,000 a year until he is thirty years old, when one-half of the principal shall be turned over to him; that thereafter all the income from the other half shall be paid to such grandson until he is thirty-five years old, when the balance shall be turned over to him, with further provisions in the event of his prior death. Having done this, Mr. Morse changed his will accordingly by making a (fourth) codicil, revoking the provisions therein made for his sons and his said two grandsons.  In that codicil the testator states that since the publication of his last will in 1908, he had sold a portion of the shares of stock mentioned therein and a number of the companies therein mentioned had been consolidated with or purchased by Fairbanks, Morse & Co., the capitalization of which had been largely increased; that "I have placed with the Harris Trust and Savings Bank, as Trustee, certificates for Ten Thousand (10,000) shares of no par value of the common stock of Fairbanks, Morse & Co. in separate trusts for" said two grandsons (naming them), "and intend to place Ten Thousand (10,000) additional shares in trust for the benefit of my said grandsons."  The remainder of the codicil makes the same bequests to the testator's sons as were made in the original will, and in the same words, except a few unimportant changes obviously necessitated by rewriting the original to fit the changed circumstances mentioned in the codicil.  It provides that in making distribution of his shares of stock between his two sons, "the shares given by me and which may hereafter be given by me in trust for the benefit of" said two grandsons "shall be deducted from the share of said Robert Hosmer Morse."

The witness Boughey testified that when this codicil and these trust agreements were signed by Mr. Morse, the latter said he would "get the certificate out so that you (Boughey) can transfer 5000 shares" to

complainant "for each of the two trusts that have just been created"; whereupon he (Boughey) "asked Mr. Morse whether he would allow or permit to have made out at the same time a certificate in the name of the Harris Trust & Savings Bank, covering the additional 10,000 shares," and that Mr. Morse replied that Boughey could do that, and Mr. Morse then took from his safe a certificate for 55,870 shares and told Boughey to go to the transfer agent in Chicago and have two new certificates issued to complainant to cover the two trusts for 5,000 shares each in favor of the grandsons, and another for 10,000 shares issued in the name of the complainant; that the witness obtained the certificates as directed; that Mr. Morse then instructed him to take the certificate for 10,000 shares to complainant's bank and "have them open a trust and give it a trust number, and tell them the dividends were to be paid to them"; that the witness followed these instructions and asked complainant's secretary, Mr. Dow, to open a trust account and give it a trust number, and collect the income from the shares of stock, telling him that as soon as Mr. Morse was certain as to the amount of his proposed donation to Rollins College, "the trust deed would be drawn up and executed"; that Mr. Dow replied that while complainant would "open the trust and give it a number," yet, "in view of the fact that the trust deed had not been executed," he thought Boughey should hold the certificate until the trust deed was executed; whereupon Boughey put the certificate in a tin box in the vault of Fairbanks, Morse & Co., and kept it there until about March 17, 1921, awaiting further instructions from Mr. Morse as to the terms and conditions to be inserted in a formal trust agreement to be signed by him and by the complainant as trustee.

During this period, considerable correspondence passed between Mr. Morse and Boughey and many of the letters are in evidence. In a letter dated No-

vember 24, 1920, Boughey inclosed a list of Mr. Morse's investments which, Boughey wrote, was "exclusive of the 10,000 shares of F. M. & Co. common stock held by the Harris Trust *in escrow* pending your decision regarding their disposition," and stating that on the basis of an income of $300,000 Mr. Morse's income tax for that year would amount to about $140,000, which "seems a very heavy tax to pay, but on incomes between $300,000.00 and $500,000.00, the tax is 63%, which is much worse."

On January 31, 1921, Boughey wrote as follows:

"Outside of the trust funds reported on now, you have the 30,000 shares of F. M. & Co. common stock in the revocable trust with the Harris Trust & Savings Bank and the 30,000 shares with the Northern Trust. You have also 10,000 shares standing in the name of the Harris Trust as Trustee with no trust Deed yet decided upon, in respect of which they are also holding $25,000.00 accrued dividends, invested in Treasury Certificates temporarily. This last-named matter will, I assume, be adjusted when you have finally decided what you will do about the College."

On February 2, 1921, Mr. Morse wrote to Boughey that "the endowment for Rollins College is likely to be secured within a few days," and asking Boughey's advice as to the best manner of providing for the payment of his subscription of $100,000, payable in annual instalments of $20,000 each "to some Trust Co. for Rollins." To this letter Boughey replied that the first payment of $20,000 "will of course come out of the fund at the Harris Trust, accumulated from dividends on the 10,000 shares of F. M. & Co. stock"; and that "at the present rate of dividend, the 10,000 shares will bring $50,000 a year," so that the payment of the other instalments from such dividends "could be regarded as quite secure." In this letter, Boughey questioned whether the trustees of Rollins College might not object to having Mr. Morse's donation "deposited with a Trust Company in Chicago," but that

he would "in any event proceed to draft out a form of deed with the First Trust & Savings Bank as Trustee." In the same letter, Boughey reminded Mr. Morse that he had mentioned at one time that he might give an annuity to a Mrs. Munger and suggested that this could be taken care of in the same trust.

To this letter Mr. Morse replied:

"I am not sure that I can have the 10,000 shares F. M. & Co. stock now in the Harris Trust transferred to the First Trust without increasing taxes. If not, how would it do to have the Harris Trust continue to hold the 10,000 shares, receiving the dividends and immediately on receipt of same remit them to the First Trust, the First Trust to pay, 1st, the amount going to Rollins until my pledge is fully paid, and 2nd, the amount for Mrs. Morse, and, 3rd, for Mrs. Munger as pr. my recent letters to you? I may be a little mixed on this subject and so will have to ask you to straighten me out."

On February 18, 1921, Mr. Morse wrote Boughey as follows:

"You will see by the enclosed clipping from this morning Tampa Tribune that I have decided to give the $100,000.00 conditional pledge to Rollins College, and not wait for the balance to be raised. You therefore may ascertain from Mr. Osborn of the First Trust & Savings if my gift to Rollins of $100,000.00 can be held by them and the full income from said gift paid to Rollins College without any tax it being for educational purposes only and the College being located in Florida.

"If it can be held by the 1st Trust & S. Co., without paying a tax, you may proceed at once to prepare the proper trust papers for me to execute, drawing from the Harris Trust the 10,000 shares of F. M. & Co. also the cash, putting all of them with the First Trust, to be used, 1st to meet my donation to the College and 2nd for Mrs. Morse, after my death, and such other beneficiaries as I may designate, say $2,000 pr. annum to Mrs. Munger in quarterly payments

during her lifetime. My payments to the College being $20,000 pr. year until the $100,000 is paid.''

On February 22, 1921, Boughey wrote to Mr. Morse that he would prepare the trust papers as suggested, and inclosed two letters addressed to complainant which he asked Mr. Morse to sign. One of these letters requested complainant to issue a cashier's check in favor of the First Trust & Savings Bank for $37,500 and accrued interest ''which you are holding for me in anticipation of the establishment by me of a new trust, and which is known by you as Temporary Account No. 1524.'' The other reads as follows:

''Some time ago I contemplated establishing a new trust with your Bank, and in connection therewith, registered in your name ten thousand shares of the Common Stock of Fairbanks, Morse & Co. I now find it necessary to abandon my contemplated plan for the new trust, and would ask that you re-transfer to me the ten thousand shares of the Common Stock of Fairbanks, Morse & Co. now standing in your name.''

These letters were signed by Mr. Morse and sent to Boughey, but Boughey never delivered them to complainant for the reason that complainant's officers demanded a fee of $10,000 to transfer the stock and the accumulated dividends. Boughey then prepared, without consulting Mr. Morse's attorney, and forwarded to Mr. Morse for his signature, a draft of a trust agreement, purporting to assign *to complainant* said 10,000 shares of stock, with directions to pay over the income, as collected, to the First Trust & Savings Bank, as trustee, until December 31, 1935, and until the death of both Mrs. Morse and Mrs. Munger, to be distributed by the last-named bank in accordance with the terms of a trust agreement with that bank ''for the benefit of Helen H. Morse, et al.,'' which ''provides among other things,'' for the payment of $100,000 and interest to Rollins College and ''for the payment under certain conditions therein set out, of portions of the income of the Trust'' to Mrs. Morse

and Mrs. Munger. This draft further provided for the payment of the principal *in 1935,* if both Mrs. Morse and Mrs. Munger were dead, to said two grandsons, or their descendants. This latter provision appears to have been Mr. Boughey's suggestion. In his letter to Mr. Morse, dated February 28, 1921, inclosing this draft, Boughey said:

"In order to avoid excessive income tax this agreement must be signed before March 15th, so to save time I am sending the draft to you just as I have drawn it up, and before Mr. Ashcraft or the Harris Trust have approved the technical wording. This will give you an opportunity of saying whether you approve the suggested disposition of the stock at the end of the period. The agreement with the First Trust can then be proceeded with in a more leisurely manner, as they will open the trust account as soon as they receive the $37,500.00.

"I do not see how you can avoid giving the 10,000 shares to C. H. M. III and R. H. M., Jr. finally, as in your will you have reduced R. H. Morse's proportion by 20,000 shares, with the statement that you have through trust funds provided that amount of stock for his two sons, but *up to date you have only placed* 10,000 shares in trust for them. * * *

"The Agreement with the First Trust & Savings Bank will of course go into more detail with regard to the disposition of the income, this being only referred to in a general way in the present agreement."

When this draft was received by Mr. Morse, it happened that Mr. E. M. Ashcraft, Jr., a member of the law firm of Ashcraft & Ashcraft, of Chicago, who had been counsel for Mr. Morse for years, was in Florida, and on March 5, 1921, Mr. Morse sent for him, produced Boughey's draft and asked Ashcraft what he thought of it. After looking it over, the latter said he did not understand the reason for the dual trusteeship. Mr. Morse explained that if complainant was required to transfer the stock and accumulated dividends to the First Trust & Savings Bank there would be some additional expense, and Mr.

Ashcraft then advised Mr. Morse that both instruments should not contain all the details of the proposed new trust with the First Trust & Savings Bank, but that such details should be specified only in the agreement with the latter. Mr. Ashcraft also called Mr. Morse's attention to the fact that the draft contained no definite statement as to the amount of income to be received by Mrs. Munger and Mrs. Morse. Mr. Morse replied that he had written to Boughey that from the income there should be paid first the Rollins College endowment of $20,000 a year for five years, and after the payment of that amount, with interest, and after the payment of $2,000 a year to Mrs. Munger, and after his death, Mrs. Morse was to have the whole income. After some further talk regarding the draft, Mr. Morse requested Mr. Ashcraft to take the draft back to Chicago, confer with Boughey and Mr. Ashcraft, Sr., and then prepare "trust agreements" and send them to him as soon as possible, "as he desired to close up the Rollins College situation as soon as he could because they were bothering him a great deal about it."

Mr. Ashcraft testified that immediately upon his return to Chicago he conferred with his father and Boughey, and soon after prepared an agreement to be signed by Mr. Morse and the complainant. This agreement he delivered to Boughey, to be sent to Mr. Morse. He also discussed with Boughey the preparation of a second trust agreement with the First Trust & Savings Bank and instructed Boughey to draft the same. Boughey prepared such a draft, but it was never submitted to Mr. Morse.

The agreement prepared by Mr. Ashcraft was sent to Mr. Morse by Boughey on March 11, 1921, with a letter suggesting that it be signed at once and as soon as it was signed to wire Boughey to that effect, in order that complainant might make the proper income tax return, which was due within a few days. When Mr. Morse received this letter and document

he was confined to his bed. He sent for his secretary and had the latter read the document to him and then signed it, and his secretary forwarded it to Boughey, wiring Boughey at the same time that he had done so. Upon its arrival in Chicago it was signed by complainant as trustee, and it is the instrument described in the first paragraph of this opinion. Mr. Morse died on May 5, 1921.

The decree appealed from assumes to define and prescribe the terms and conditions of "Trust No. 2343." For that purpose, it apparently adopts, as the oral declarations of Mr. Morse, substantially all of the provisions of the second unexecuted agreement, which was drafted by Mr. Boughey after conference with Mr. Ashcraft and the trust officers of the First Trust & Savings Bank, but which was never submitted to Mr. Morse for his approval, nor signed by him. That draft is essentially different from the draft which Mr. Morse had talked over with Mr. Ashcraft in Florida and contains provisions not mentioned in Mr. Morse's letter to Boughey, dated February 18, 1921, including a provision for the final transfer of the stock in question to the two grandsons in 1935. There is no direct evidence in the record that this provision, and several others of minor importance, were ever approved by Mr. Morse. The main question here involved is whether this evidence is sufficient to sustain the decree.

It is conceded by counsel that a court of equity may establish and enforce a voluntary oral trust concerning personal property. The authorities hold, however, that "the acts or words relied on must be unequivocal, admitting of but one interpretation, and manifesting a completed transaction *in præsenti*" (*Trubey v. Pease*, 240 Ill. 513, 521); and that the proof of such acts or words must be clear and convincing proof, not only of the existence of the trust, but also as to its essential terms and conditions. (39 Cyc. 84; *Wright v. Buchanan*, 287 Ill. 468, 478; *Marble v.*

*Marble's Estate,* 304 Ill. 229, 235; 1 Perry on Trusts, 2d Ed., sec. 23.) Such a trust is not created where there is a mere intention to create it, or a voluntary agreement to do so, and the settler contemplates some further act for the purpose of giving it completion. (*Lloyd v. Brooks,* 34 Md. 27, 33; Lewin on Trusts, 12th Ed., sec. 71.) "Declarations of a purpose to create a trust not carried out are of no value, nor are direct promises to that effect unaccompanied with considerations turning them into contracts." (*Allen v. Withrow,* 110 U. S. 119, 130.) "If a trust is perfectly created, so that the donor or the settler has nothing more to do, and the person seeking to enforce it has need of no further conveyances from the settler, and nothing is required of the court but to give effect to the trust as an executed trust, it will be carried into effect, although it was without consideration. * * * But if, on the other hand, the transaction is incomplete, and its final completion is asked in equity, the court will not interpose to perfect the settler's liability, without first inquiring into the origin of the claim and the nature of the consideration given." (*Barnum v. Reed,* 136 Ill. 388, 400.) "Where there is only a voluntary agreement for the creation of a trust, a court of equity will not regard the agreement as binding so long as it remains executory." (*McCartney v. Ridgway,* 160 Ill. 129, 155.) In such cases, a court of equity will not lend its aid to establish a trust at the instance of mere volunteers, but will decline all interference in the matter. (*Barnum v. Reed, supra.*) It has also been held in this State that when a trust has been perfectly created, it is not revocable at the will of the party who created it, unless he has expressly reserved the power of revocation. (*Trubey v. Pease, supra,* 521; *Light v. Scott,* 88 Ill. 239, 245.)

Tested by these well-settled principles, we think the evidence in this case is insufficient to sustain the decree. Certainly it fails to show, by that degree of

Harris Trust & Savings Bank v. Morse, 238 Ill. App. 232.

clear and convincing proof requisite to establish a voluntary oral trust, that Mr. Morse ever definitely declared, or definitely decided, what disposition he would ultimately make of the shares of stock in question. During the year prior to his death, Mr. Morse made several declarations as to his intentions regarding the disposition of these shares, and these declarations leave the matter involved in doubt and uncertainty.

In the fourth codicil to his will, made in June, 1920, he stated that he intended to place "10,000 additional shares" in trust for the benefit of his grandsons. But the codicil does not say when or under what circumstances, or upon what terms and conditions, this contemplated trust should become effective, and at the time he made this codicil, he orally declared to Mr. Boughey that he would not place such shares in trust for his grandsons at that time because of his promise to Rollins College. A certificate for those shares was made to complainant, but this was held by Mr. Boughey until after March 17, 1921, *awaiting further instructions* from Mr. Morse.

In his letter of February 18, 1921, above quoted, Mr. Morse directed "trust papers" to be prepared for him to execute, which should provide for transferring the shares of stock and the accumulated dividends thereon to the First Trust & Savings Bank, "to be used," first, to pay the Rollins College donation, and second, *after his death, "for Mrs. Morse and such other beneficiaries"* as he might designate, *"say $2000 per annum to Mrs. Munger in quarterly payments during her lifetime."* There is no mention in that letter of any trust for the grandsons' benefit, and if "trust papers" had been prepared in accordance with his instructions at that time, and had been executed by Mr. Morse, it is clear that the grandsons could not have compelled their grandfather, by any proceeding at law or in equity, to carry out his previously expressed intention to place those shares

in trust for their benefit. Instead of following Mr. Morse's instructions, Mr. Boughey inserted in the trust agreement which he prepared and sent to Mr. Morse, a clause providing that the "principal of the trust fund"—meaning, no doubt, the 10,000 shares and the remainder of the accumulated dividends thereon for fifteen years—should be paid in 1935 to the two grandsons, provided neither Mrs. Morse nor Mrs. Munger was living at that time. In his letter to Mr. Morse inclosing this draft, Mr. Boughey wrote that he was sending the draft without having it approved by complainant or Mr. Ashcraft, so as to give Mr. Morse "an opportunity of saying" whether he approved "the suggested disposition of the stock at the end of the period." There is no evidence in the record that Mr. Morse ever approved this suggested ultimate disposition of the stock, unless such approval may be inferred from the absence of any evidence that he objected to it while discussing the draft with Mr. Ashcraft. We think no such inference is warranted, since the draft was handed to Mr. Ashcraft unsigned by Mr. Morse, with directions to prepare and submit to him, for his approval, two corrected drafts.

By the terms of the new agreement with complainant, which Mr. Morse signed, complainant's only duties were to collect the dividends and turn over the same (together with the stock itself, whenever so required) to the First Trust & Savings Bank, to be held by it "as Trustee under an agreement with Charles Hosmer Morse, being Trust No. 2343." If, in fact, no such agreement was ever made between that bank and Mr. Morse, it is obvious that "Trust No. 2343" remained at his death only a matter of intention on his part,—a trust "in the making" perhaps, but never in fact completed—half formed and indefinitely designed.

It is conceded that no *written* agreement was made with Mr. Morse, specifying the nature and purpose of "Trust No. 2343." If any *unwritten* agreement

was ever made of that character, a careful examination of the evidence fails to disclose it. There is evidence to the effect that both Mr. Boughey and Mr. Ashcraft several times discussed with the trust officers of the bank, the provisions of a proposed written agreement such as they thought Mr. Morse desired to make with the bank, and that a draft of such an agreement was prepared by Mr. Boughey, which, after being submitted to the bank's officers and after some changes were made to suit their views, was tentatively approved by them; but there is no evidence, or claim, that Mr. Morse ever saw or heard of that draft after it was thus prepared, and there is no evidence, or claim, that either Mr. Boughey or Mr. Ashcraft had any authority from Mr. Morse to make any definite agreement for him or in his behalf. His last instructions to them were to prepare trust agreements for him to sign, containing not only his own ideas, but their suggestions as well. Whether he would have approved such suggestions, and the ultimate disposition of the stock as provided by the last draft, cannot now be told. To paraphrase an expression found in *Coningham v. Plunkett*, 2 Y. & C. (Eng. Ch.) 245, what was done was only preparatory; he did nothing which he could not have countermanded; had he lived he might have revoked his instructions; his death effectually did so.

Since, therefore, no agreement, written or unwritten, was ever made between the First Trust & Savings Bank and Mr. Morse concerning the disposition of the stock in question and the dividends thereon, "Trust No. 2343" never became effective as a "completed transaction *in præsenti*." In the absence of such an agreement, it remained merely "a trust number,"—a transaction existing only in contemplation. The shares of stock and accumulated dividends never passed beyond the control of Mr. Morse by any act or declaration of his during his lifetime, and they now belong to his estate. All his declarations,

oral and written, shown by the evidence, are mere declarations of "a purpose to create a trust not carried out," which, under the authorities cited, "are of no value" as evidence of a voluntary trust.

It has been held that if a person intends to establish a trust and with that intention transfers the title to the trust property to a trustee, and orally states what the terms and conditions of the trust are to be, these facts, though clearly proved, are insufficient to create a voluntary trust, where it also appears that the donor intends the trust to be established by a written instrument or deed signed by him. (*Lloyd v. Brooks*, 34 Md. 27; *Bayley v. Boulcott*, 4 Russ. 345; *Coningham v. Plunkett*, 2 Y. & C. (Eng. Ch.) 245; *Payton v. Almy*, 17 R. I. 605.) Here, it was admitted upon the witness stand, both by Mr. Boughey and the younger Mr. Ashcraft, that all their conversations with Mr. Morse contemplated the execution of a written, and not an oral, declaration of trust; and where such is the fact, the authorities cited hold that the trust is not established until such written instrument is executed. Complainant's counsel cite cases apparently holding the contrary. But, in such cases, there was a consideration involved, so that the trusts upheld or established were not voluntary and the beneficiaries were not mere volunteers, as in this case. The pledge to Rollins College is not dependent, as we understand the evidence, upon the disposition of the 10,000 shares of stock in controversy. Mr. Morse definitely promised to pay that college $100,000 in five annual instalments with interest, and then asked Mr. Boughey to suggest the best method of providing for such annual payments out of his income. Boughey suggested that the income from these shares might be used for that purpose, and Mr. Morse adopted the suggestion and directed Boughey to put the suggestion into the proposed trust agreement. The College was not intended to be a party to that agreement, however, nor would it be bound to collect its pledge

from that source alone, even if any such trust agreement had been executed.

We conclude, therefore, that the only trust which is shown by the evidence to have been effectively declared and established by Mr. Morse was the trust agreement he made with the complainant, and that the provisions of that agreement as to the powers and duties of the First Trust & Savings Bank are so indefinite and uncertain that no trust with the latter was created; that upon the death of Mr. Morse a resulting trust therefore arose in favor of the heirs and devisees of Charles Hosmer Morse, deceased, as to any money or property received by said bank or the complainant; and that the 10,000 shares of stock held by complainant, together with the accumulated dividends and income collected upon the same, belong to the estate of said deceased, and should be paid to the executor. The decree of the superior court is accordingly reversed and the cause is remanded with directions to enter a decree in conformity with this conclusion.

*Reversed and remanded with directions.*

Barnes, P. J., and Gridley, J., concur.

Additional Opinion Filed on Petition for Rehearing.

Appellee's counsel suggest that the foregoing opinion might be construed as requiring the superior court to eliminate from its decree all reference to the fees and expenses allowed to appellee and its solicitors, and the fees allowed to the guardian *ad litem.* The opinion does not so state, and it was not so intended. No error was assigned in which such allowances were questioned. Appellant did assign error upon the refusal of the trial court to allow solicitors' fees to him as well as to appellee, and in support of this assignment of error cited the case of *Lombard v. Witbeck,* 173 Ill. 396, where it is said (p. 413): "We said in *Woman's Union Missionary Society v. Mead,* 131 Ill. 338: 'As to the amounts allowed by the court to the respective parties, they are so far in the discre-

tion of the chancellor that in the absence of proof of the abuse of that discretion we cannot interfere.' '' In that case, it was also said that such allowances, when made, are usually treated as costs. There was no proof in this case that the discretion of the chancellor had been abused, and therefore, under the rule stated, there was no error in that respect in the decree.